**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JESSICA JACOBSEN** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 20-6357** |
| | : | |
| **MERON MEDICAL, LLC et. al** | : | |

---

**McHUGH, J.**                                                                                     **May 18, 2022**

**MEMORANDUM**

      This matter involves federal and state claims of sex discrimination, brought by a female employee who alleges that she was subjected to a hostile work environment and terminated in retaliation for having lodged a complaint. As to her federal claims, the company where she works lacks sufficient employees to meet the numerical threshold imposed by Title VII. She therefore argues that related entities are either her joint employer or can be viewed as a combined single employer triggering the protections of federal law. As to that threshold issue, I am persuaded that there is evidence from which a jury could find in Plaintiff's favor. As to the merits, with respect to the hostile work environment claim, although Plaintiff identifies severe and pervasive instances of sexually harassing behavior from a co-worker, there is insufficient evidence that her employers were aware of this harassment. There is, however, sufficient evidence from which a reasonable jury could find that Plaintiff's termination was retaliatory. Defendants' motions for summary judgment will therefore be granted as to Plaintiff's hostile work environment claims but denied as to her claims of retaliation.

## I.    Factual and Procedural Background

      Jessica Jacobsen brings claims for gender discrimination/hostile work environment and retaliation under Title VII, 42 U.S.C. § 2000e *et seq*., and the Pennsylvania Human Relations Act

("PHRA"), 43 PA. STAT. §§ 951 *et seq.*, against Meron Medical, LLC ("Meron") and Insperity

PEO Services, L.P. ("Insperity").  *See* Am. Compl. ¶¶ 55-66, ECF 15.

      a.    <u>Background on the Entities Involved</u>

     As noted at the outset, to meet the numerical threshold for applicability of Title VII—15

employees—Plaintiff is proceeding under a joint employer or single employer theory. An

understanding of the involved entities is therefore necessary.  Plaintiff has named both Insperity

and Meron as Defendants.  Meron Medical is a spin-off of its parent company, M&S Centerless

Grinding, Inc. (M&S).  Shegda Dep. (Aug. 25, 2021) 14:7-8, ECF 23-3, Ex. 4.  In 2019, Meron

had about 9-12 employees, while M&S had approximately 30 employees.  *Id*. 15:1-13.  In 2019,

the two businesses were located four miles apart.  *Id*. 15:20-23.  They also share ownership: In

2019, Meron and M&S each had the same President: John Shegda.  Id. 13:21-14:1.  Meron was a

wholly owned subsidiary of M&S and John Shegda was the sole shareholder of M&S.  *Id*. 13:21-

14:8.

     Mr. Shegda contracted with Insperity PEO Services, L.P. ("Insperity"), which is a

professional employment organization (PEO) employing approximately 3,500 employees, to

provide administrative functions, such as payroll, benefits, tax remittance, and related government

filings for Meron and M&S.  Shegda Dep. 50:1-6; Client Service Agreement, ECF 21, Ex. F;

Insperity Form 10-K, ECF 23-3, Ex. 5.  Insperity and Meron have no common ownership and do

not share any records.  Lecia Chaney Affidavit, ECF 21, Ex. C.[1]  In December 2016, Insperity and

Meron signed a Client Service Agreement (CSA) that refers to Insperity and Meron as having a

"co-employment relationship."  Client Service Agreement, ECF 21, Ex. F.  It states that Insperity

---

[1] Plaintiff states that the Court should disregard this affidavit, as the witness was not disclosed during discovery.  Pl.'s Br. at 26, ECF 22-1.  However, the Court finds that there is no prejudice to Plaintiff in considering the affidavit, as the statements therein are confirmed by other documents in the record and Plaintiff cannot reasonably argue surprise or lack of notice.

paid Meron employees' salaries and wages, which were set and reported by Meron. *Id.* ¶ 2(A). Insperity provided employee benefits, as well as eligibility to participate in an Insperity-sponsored 401K plan. *Id.* ¶¶ 2(C),(F). Insperity also agreed to provide HR services, which exceeded mere administrative tasks and included substantive management trainings, employee counseling, and complaint investigation services. Shegda Dep. 50:17-23; 51:20-53:14. Meron did not have any internal human resources staff and relied entirely on Insperity for provision of human resources services and personnel. Shegda Dep. 31:16-23; 50:7-23.

Plaintiff's involvement with these companies began in 2015, when she was hired by John Shegda to be the office manager at M&S. Offer Letter, ECF 23-3, Ex. 1. It is undisputed that Insperity was not at all involved in Plaintiff's hiring. In April 2016, Jacobsen entered into an employment agreement with Insperity, which refers to Insperity as M&S's co-employer. Employment Agreement, ECF 23-3, Ex. 2. The Agreement states that M&S assigns her duties, but pursuant to the "co-employment relationship," "Insperity reserves the right of direction and control over the Employee, including a right to hire or terminate, and a right to resolve workplaces disputes not subject to a collective bargaining agreement." *Id.* In the spring of 2016, M&S transferred Jacobsen to work for Meron. Jacobsen Dep. (Sept. 9, 2021) 82:22-24, ECF 23-3, Ex. 3.

b.   <u>Harassment Following Transfer to Meron</u>

As to the conduct Plaintiff contends created a hostile work environment, Plaintiff alleges that Tony Auon, a Meron employee, routinely sexually harassed her. Plaintiff states that even before her transfer to Meron, Shedga, President of both Meron and M&S, warned Plaintiff that Auon, one of her soon-to-be co-workers at Meron, was old school and chauvinistic. Jacobsen Dep.

153:12-24.[2]  Shegda told her that Aoun had had issues with another woman in the office previously and had stated, "I will never have a woman as a boss," but that Shegda was confident that Plaintiff could handle it because she was a strong woman.  *Id*. 154:13-155:22.  Both Aoun and Plaintiff reported directly to Shegda and Shegda remained Plaintiff's supervisor for the duration of her employment with Meron.  Shegda Dep. 77:20-24; Meron Organizational Chart, ECF 23-5, Ex. 9.

Plaintiff alleges that Auon's sexual harassment toward her largely began in early 2017 while Plaintiff was going through a divorce, at which point Aoun began continually asking her prying questions into her personal life, including about when she would start dating again. Jacobsen repeatedly told him to stop.  Jacobsen Dep. 19:15-18; 244:9-245:2; March 24, 2017 text from Jacobsen to Aoun, ECF 23-6, Ex. 12 (telling Aoun that she doesn't "want to date anyone right now.  So I'd like to not talk about it.").  One day in the kitchen, Aoun told her, "if I wasn't married, me and you would hook up." Jacobsen Dep. 156:9-17.  Plaintiff informed him that she would never hook up with a co-worker, at which point Aoun became angry and his demeanor towards her changed.  *Id*. 157:7-18; 158:9-11.  In the summer of 2017, Aoun also made comments about his wife, stating, "she belongs at home.  She's doing what she's supposed to do being at home and cooking my meals."  *Id.* 74:5-15.

Throughout 2018 and 2019, Plaintiff alleges that Aoun continued to harass her at work, including by making graphic and sexually explicit comments about Plaintiff's body.  For example, she states that Aoun told her one day that if she wore certain pants to work, "the guys will walk around with boners all day."  Jacobsen Dep. 181:20-24.  He also told her that "the first thing guys notice about you is your boobs;" not to wear turtlenecks because they made her look "frumpy;" and, after sharing about his wife's breast implants, told Plaintiff, "you definitely don't have to

---

[2] Shegda disputes ever warning Plaintiff that Aoun was chauvinistic, Shegda Dep. 48:21-23, but admits that he had heard Aoun say that he would never have a woman boss, *id*. at 168:19-22.

worry about that." *Id*. 20:1-10; 198:15-24; 199:20-23.   Aoun also bragged to Jacobsen about his own sexual exploits, describing an instance in which he had been seen by another Meron employee while he and his wife were naked and having sex in their car.  *Id.* 186:3-187:19.   On another occasion, he told Plaintiff about receiving oral sex from another woman while his wife was nearby. *Id*. 162:18-21.  Aoun also repeatedly made disparaging and sexually offensive comments about Jacobsen, stating "you must be getting your period" or "it must be that time of the month" if he perceived her to be unpleasant or if she worked from home and then returned to work.  *Id*. 20:1-19.

Plaintiff began complaining generally to Susan Manno, an Insperity employee who worked with Meron and M&S as their assigned HR specialist from May 2017 through September 2018 and was sometimes physically present at the Meron Office.  Manno Dep. (Sept. 22,2021) 11:16-22; 33:22-34:1; 45:7-11, ECF 23-6, Ex. 13.  Plaintiff's complaints were that Aoun "completely disrespected her and did not take her seriously," and that he was "very, very crude and embarrassed her, you know, several times in front of employees by diminishing her position, also making it known that she was a woman in a man's environment and that was very serious to me." *Id.* 47:14-48:3.  Manno states that she shared these complaints with Shegda. *Id.* 48:5-6.  As discussed below, she did so in general terms and did not convey details that would have revealed the explicitly sexual character of the conduct.

At Shegda's request, Manno counseled Aoun a number of times on his management skills and employee relations. *Id*. 37:10-38:19.[3]  During the counseling sessions, Aoun told Manno that he was "Shegda's guy" and to disregard Jacobsen, stating, "don't worry what Jessica says, you know, I'm the person who makes all the decisions back here so don't pay attention to her." *Id*.

---

[3] The record is not clear as to whether these sessions were requested as a result of Ms. Jacbosen's complaints.

65:18-66:8.  Manno testified that she did not feel that Aoun respected her during these sessions and that his behavior did not improve following the counseling.  *Id*. 39:21-24; 41:23-42:1

In May 2018, there was purportedly an incident in which Aoun lashed out at Jacobsen while Shegda was away.  Jacobsen Dep. 12:12-17.  Aoun yelled at her, "nobody likes you here.  You cause all the drama here.  You don't belong here." *Id.* 12:21-23.  Jacobsen called Shegda to complain, who suggested that she must have done something wrong to make Aoun act out, told her not to go near Aoun, and that the three of them would sit down together, a meeting which never happened.  *Id.* 14:16-15:5.

After this incident, Plaintiff alleges that both Shegda and Aoun began to treat her differently.  *Id.* 15:16-20.  Plaintiff alleges that Aoun's behavior "progressively got worse and worse." Jacobsen Dep. 29:4-5.  She reports that Aoun continued to talk down to her and "didn't treat me how he treated the men.  He treated me differently because I was the only female in the building.  And it was very, very clear that he did not want me there because I was a female.  He didn't want any females in that building, at all, which he said on multiple occasions." *Id.* 16:3-13.

And in spite of her verbal complaints to Shegda about Aoun's disrespectful treatment of her, Plaintiff stated that Shegda "didn't really seem to care" and would make Tony apologize, but then "avoid" her.  *Id*. 17:13-17.  Plaintiff also began to notice that Shegda excluded her from group texts and was delayed in his email responses to her.  *Id*. 35:18-36:1.

Shegda does not dispute that Plaintiff was once a key player whose importance to the company diminished over time, but offers a different explanation.  Shegda Dep. 94:16-23.  In 2018, Shegda began to consider a merger of M&S and Meron with a third company.  *Id*. 96:7-24.  In the fall of 2018, Shegda alleges that he informed Plaintiff that if there were to be a merger, there would be significant administrative overlap, so he encouraged her to "become more valuable to

6

the organization" and to take on additional responsibilities. *Id*. 97:1-98:5.   According to Shegda,

Plaintiff never took that advice. *Id.*   Instead, by summer or fall 2019, Jacobsen's workload "had

dropped way off" and she had failed to take initiative to seek new responsibilities. *Id.* 98:13-99:6.

In late August 2019, Shegda formed a transition team prior to the merger that consisted of two

women and two men, one of whom was Aoun. *Id.* 124:21-125:17.   Shegda alleges that he

"intentionally" left Plaintiff off of the transition team because she was not integral to the merger

process. *Id*. 94:18-23; 99:6.

> c.   Plaintiff's Written Complaint, Ensuing Leave, and Ultimate Termination

On September 16, 2019, Jacobsen sent an email to Shegda formally complaining in writing

about her treatment:

> After much reflection on the uncomfortable issues with Tony [Aoun], more
> specifically, the incident that occurred during this past summer wherein Tony
> disrespected me verbally and acted unprofessionally. Since that time, there has been
> a disengagement in the internal business communications between me, you and
> Tony that are indeed relevant to my responsibilities and duties. You are
> unresponsive to my emails, not interacting with me on a daily basis, I have been
> removed from group text messages and my requests to communicate with you have
> been ignored. The air of hostility is evident. The pending merger with KVI is being
> talked about by Tony with others and I have not been included. I am a Manager and
> should be included in a business changing event. I am a key team player.
>
> The disrespect and hostile actions cannot be excused by your labeling him
> "Chauvinistic". That is unacceptable on all fronts. It is evident that I have been
> treated differently and it is becoming uncomfortable for me and inflicting mental
> distress.
>
> I would very much like a resolution.

Jacobsen's Email, ECF 23-6, Ex. 17.

Shegda passed on Plaintiff's complaint to Insperity, at which point Sharice Sargent, an

Insperity HR Specialist, became involved.  Jacobsen Dep. 333:1-24; Jacobsen Notes of Call, ECF

23-6, Ex. 18.  After Jacobsen explained her complaints to Sargent, Sargent emailed the Insperity

EEO team with the subject line "Meron Medical. . . Gender Discrimination Allegations from EE."
ECF 23-6, Ex. 19.   The body of the email stated, "EE believes there is discrimination action
towards her based on her gender and her manager is retaliating against her after reporting it.   She
states a colleague is inappropriate with comments and bereded (sic) her creating a hostile work
environment.   The company is undergoing a layoff and she believes her position is in jeopardy as
a result of her report."   *Id*.   Insperity assigned Frankie Williams, an EEO Specialist, to investigate
Jacobsen's complaint.   Insperity Emails, ECF 23-7, Ex. 21.

In the days following Plaintiff's complaint, Shegda and Sargent continued to engage with
Plaintiff.   On September 19, Shegda and Sargent spoke to Plaintiff and she reiterated her
complaints.   Shedga Call Notes 9/19, ECF 23-7, Ex. 22.   Plaintiff alleges that it was during this
meeting that she first learned about the transition team's existence.   Jacobsen Dep. 98:6-9, 99:12-
100:5.[4]   On September 20, Williams documented a call between herself and Sargent wherein
Sargent told her that Shedga was leaving the country and that Jacobsen was causing so much chaos
that he wanted her to go out on two week paid leave while he was gone.   Williams Matter Notes,
ECF 23-7, Ex. 23.   Plaintiff alleges that Sargent then presented her with the leave option and
encouraged her to take it, noting that it was a "generous offer."   Jacobsen Email to Schoon, ECF
23-7, Ex.28. Also on September 20, Sargent texted Shegda and told him, "there is no risk with the
full paid leave you're offering Jessica."   Sargent Text, ECF 23-7, Ex. 25.

On September 23, Shedga had a conversation with Jacobsen and Sargent in which he forced
Plaintiff to take a paid, two week leave of absence.   Shegda Call Notes, ECF 23-7, Ex. 27; Shegda

---

[4] I note that Plaintiff's emailed complaint, sent prior to this call, references the upcoming merger and not
being included.  Plaintiff alleges that her complaint referred to being excluded from the management team,
as she was unaware that there was a transition team when she emailed her complaint.

Dep. 118:11-15.[5] Shegda testified that Plaintiff, rather than Aoun, was put on leave because he needed a "physical separation" of Plaintiff and Aoun and "Tony's skill set is very particular and pretty much irreplaceable. . . I had replacement for Jessica and no replacement for Tony." Shegda Dep. 119:12-19; 120:4-5. Jacobsen then emailed Sargent's supervisor, Lauren Schoon, complaining of retaliation and reporting that she had been forced to take a leave. Jacobsen Email, ECF 23-7, Ex. 28. On September 24, eight days following her complaint, Williams spoke to Plaintiff for the first time. Williams Notes, ECF 23-8, Ex. 31. Williams' notes reflect that Jacobsen reported to her that Aoun doesn't like her, has stated that women don't have a place in the shop, that Aoun yells at her, and that she wants Aoun to leave her alone. *Id.*

In advance of her return to work from the two-week leave, Shegda and Sargent exchanged a series of texts discussing next steps. October 4 Texts, ECF 23-8, Ex. 34. Sargent told Shegda that "there is a risk if you prevent return" to which Shegda responded, "At this point I am willing to risk. I cannot let this go on. I feel that she is going to sue me (or the company) whenever the day comes. It might as well be now. We can talk more on Monday." *Id*. Shegda later stated that he understood the risk that Sargent mentioned to mean that if Plaintiff were not allowed to return to work, "the optics of that would be—could be interpreted as retaliatory." Shegda Dep. 146:1-4. In response to this concern, Sargent replied, "[u]nderstood however have her return to meet with you then make a decision. Frankie and I are both recommending so you do not add a leave issue as well." October 4 Texts, ECF 23-8, Ex. 34. On October 7, two days before Plaintiff was scheduled to return to work, Sargent emailed Williams to let her know that Shegda had finalized the merger and that Jacobsen's position would be affected. ECF 23-8, Ex. 38.

---

[5]Specifically, Plaintiff alleges that Shegda "outright" threatened her job at this meeting by "insinuating that it could be a permanent leave if I didn't behave or if I didn't comply." Jacobsen Dep. 304:3-9.

On October 8, Williams emailed Jacobsen with the results of Insperity's investigation. ECF 23-8, Ex. 39.  According to Insperity, Plaintiff's main complaint was that she was excluded from the transition team because "(1) [Shegda] is retaliating against her for filing a complaint against your colleague Todd Black 18+ months ago and (2) because [she is] a woman." [6] *Id*. Williams concluded that the reason Plaintiff was not placed on the team was neither discriminatory nor retaliatory, as evidenced by the fact that the transition team is diverse and composed of men and women. *Id*. Williams testified that she "doesn't think" she ever interviewed Aoun or Black about Plaintiff's complaints during her investigation.  Williams Dep. (Dec. 23, 2021) 114:12-19, ECF 23-8, Ex. 33.  She further represented that she "did not do a harassment investigation," but merely investigated why Plaintiff was not put on a committee.[7] *Id*. at 67:19-68:24.

On the morning of October 9, Plaintiff emailed Williams highlighting the deficiencies in the Insperity investigation, including that she had raised more than complaints about her exclusion from the transition team, and reasserting her hostile work environment complaint.  ECF 23-9, Ex. 43.  Later that day, Plaintiff met with Shegda and Sargent, at which point they terminated her employment with Meron and Insperity.[8]  Termination Letter, ECF 23-9, Ex. 44; Jacobsen Dep. 315:2-11.

---

[6] Williams' email identifies the wrong employee.  Todd Black was another employee who Plaintiff alleges was a witness to Aoun's behavior.   Williams Dep. 152:14-154:17; Jacobsen Email to Williams, ECF 23-9, Ex. 43.  Plaintiff also contends that Williams misstates Plaintiff's complaint as her being excluded from the transition team for the pending merger, because Plaintiff was instead complaining of being pushed out of the management team, and in fact was not aware of the transition team's existence.  Pl.'s Br. at 13, ECF 23-1.

[7] The investigation began as an Equal Employment Opportunity (EEO) investigation.  *See* Sargent Email to EEO team, ECF 23-6, Ex. 19.  At some point in the process, Insperity  concluded that it was a more generic Employee Relations (ER) investigation not linked to gender, and Williams therefore did not follow Insperity's internal EEO protocols.  *See* October 7 Email Williams to Sargent, ECF 23-8, Ex. 38 ("This matter isn't EEO based on her allegation about the transition team and John.").

[8] On October 9, prior to the return-to-work meeting with Plaintiff, Shegda had corresponded with Sargent about the termination letters that Sargent had provided to him.  ECF 23-9, Ex. 42.

Plaintiff filed claims for gender discrimination/hostile work environment and retaliation under Title VII and the PHRA against Meron and Insperity.  Am. Compl., ECF 15.  Both Defendants filed motions for summary judgment, ECF 20, 21.

## II.   Standard of Review

Defendants' Motions are governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.   Discussion:

### a.   Joint Employment Under Title VII

Title VII of the Civil Rights Act of 1964 prohibits companies employing "fifteen or more" persons from discriminating on the basis of sex in hiring, discharge, compensation, or terms of employment.  42 U.S.C. §§ 2000e(b), 2000e–2(a)(1).  "[T]the fifteen-employee minimum should be strictly construed."  *Nesbit v. Gears Unlimited, Inc*., 347 F.3d 72, 85 (3d Cir. 2003).  "Two entities may be 'co-employers' or 'joint employers' of one employee for purposes of Title VII." *Faush v. Tuesday Morning, Inc*., 808 F.3d 208, 215 (3d Cir. 2015).  Joint employment occurs where "two entities exercise significant control over the same employees."  *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997).

In determining the existence of an employment relationship for purposes of Title VII, "employee" is understood to describe the conventional master-servant relationship from common-law agency doctrine.  *Faush*, 808 F.3d at 213.  The common-law agency test articulated in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) governs in the Title VII context.  *Id*. at 214.  *Darden* provides a non-exhaustive list of relevant factors, including:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party

> has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323–24.  Essentially, in discerning whether an entity should be considered to be an employer for purposes of Title VII, courts in the Third Circuit focus on "which entity paid [the employees'] salaries, hired and fired them, and had control over their daily employment activities.'" *Faush*, 808 F.3d at 214 (cleaned up).  In conducting this inquiry, however, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Darden*, 503 U.S. at 324 (cleaned up).

Meron Medical employed about 9-12 people during the relevant time frame.  As such, on its own, it does not meet the minimum threshold required for Title VII to apply.  To surmount this obstacle, Plaintiff first argues that Insperity, a professional employment organization which employs over 3,500 people, was her joint employer for purposes of Title VII.  Separately, Plaintiff further argues that Meron's parent company, M&S, which employed approximately 30 people, was Plaintiff's joint employer or should be considered together with Meron Medical as a single employer for purposes of Title VII.  To survive summary judgment under these theories, Plaintiff must point to genuine issue of material fact as to the existence of an "employment relationship" with Insperity or M&S.  *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013).

   b.  Insperity as Joint Employer

An analysis of the *Darden* factors persuades me that there are genuine issues of material fact and there is evidence in the record from which a reasonable juror could find that Insperity was Plaintiff's joint employer.  The method of payment, provision of benefits, and tax treatment weigh

in favor of finding an employment relationship.  Insperity and Meron signed a Client Services Agreement ("CSA") providing that Insperity paid Meron employees' salaries and wages; Insperity maintained workers' compensation insurance for Meron employees; Insperity offered Meron employees numerous employee benefits, including medical, dental, vision, life, and disability insurance, a health care flexible spending account and a health savings account program; and Insperity offered Meron employees eligibility to participate in an Insperity-Sponsored 401(k) plan. In addition, the Agreement specifies that Insperity provided its services to Meron as a "co-employer."  Mr. Shegda testified that it is his understanding that anyone who worked for Meron also worked for Insperity.  Shegda Dep. 60:3-6.

Plaintiff's payroll records indicate that Insperity paid Plaintiff's salary.  Plaintiff's tax treatment also identifies Insperity as her employer.  Both Meron and Insperity are listed on Plaintiff's 2018 W-2, but in the W-2's address and EIN section, only Insperity's information is included.  ECF 23-5, Ex. 10.  Moreover, her W-4 and Local Earned Income Tax Residency Certification Form for 2018 identifies only Insperity as her employer.  ECF 23-6, Ex. 11. Defendant attempts to minimize this by noting that Insperity merely provided administrative payroll processing whereby it charges a comprehensive service fee to Meron that includes Meron's payroll, so Meron is the entity who should be considered to actually pay Plaintiff, even if Insperity cuts the checks.  Insperity also emphasizes that it is undisputed that Meron alone set Plaintiff's rate of pay bonuses and overtime.  But in its 2019 10-K Annual Report submitted to the SEC, Insperity states that Insperity assumes ultimate liability for paying employees' salaries that is "not contingent on the prepayment by the client of the associates comprehensive service fee," rather "as a result of our employment relationship with each of our [worksite employees], we are liable for payment of salary and wages to [worksite employees] as reported by the client and are

responsible for providing specified employee benefits to such persons regardless of whether the client pays the associated comprehensive service fee."  ECF 23-3, Ex. 5 at 9.  Thus, Insperity assumed legal liability for paying Plaintiff's salary.

More significantly, Insperity also agreed to provide HR services for Meron, which included "developing human resource policies, help[ing] design and implement an employee handbook, advis[ing] on human-resource matters as-requested, and mak[ing] available required human resource notices."  CSA, ECF 21, Ex. F.  Insperity provided on-site sexual harassment training on one occasion, Jacobsen Dep. 102:2-24, as well as "performance improvement training."  Shegda Dep. 50:19-24.  If an HR issue arose, Meron President John Shegda testified that Meron would reach out to Insperity to get advice on how to handle the situation.  He also stated that there were "a couple of the HR specialists" who would occasionally "come and be present on site to help facilitate a conversation, to help resolve a problem."  *Id.* 52:3-9.  Insperity guided Meron regarding human resource and legal compliance issues.  Shegda Dep. 60:11-14.  Notably in this case, Insperity's HR services investigated Plaintiff's sexual harassment complaint.  Meron had no dedicated HR employee in house and instead relied entirely on Insperity to serve its HR needs.  *Id.* 53:15-54:6.  The CSA also indicates that both entities have concurrent responsibilities for internal compliance with Title VII and other federal and state employment laws.

On the other hand, the limited degree of control over daily employment activities weighs against finding Insperity a joint employer.  Although Plaintiff makes much of the fact that in the Agreement between Jacobsen and Insperity, Insperity retained a contractual "right of direction and control, including a right to hire or terminate, and a right to resolve workplace disputes not subject

to a collective bargaining agreement,"[9] it is undisputed that, in actuality, Meron had control over Plaintiff's daily tasks and job functions.  Insperity did not control her day-to-day activities; set her hours, schedule, or vacation time; establish her payrate; assign or supervise her projects; or determine her working conditions.  Jacobsen Dep. 120:20-122:16.  Ms. Jacobsen worked on Meron's property and Meron provided the instrumentalities and tools for her job.  Insperity did not have offices on site and only visited infrequently.  Insperity also states that that it did not discipline or evaluate employees, however, former Insperity employee, Susan Manno indicates that she conducted Meron employee performance evaluations during her tenure with Insperity and discusses providing discipline to employees.  Manno Dep. 109:18-111:7; 115:11-24.

Finally, an analysis of which entity hired and fired Plaintiff reveals facts that cut both ways.  It is undisputed that Insperity neither interviewed nor hired Plaintiff.  The record also indicates that the ultimate decision to fire Plaintiff was made by Meron.  Nonetheless, the record reflects that, given Insperity's role as Meron's only HR provider, Insperity was involved in her termination.  The Insperity EEO department was responsible for speaking to Plaintiff and investigating her complaint, an investigation which Plaintiff alleges was flawed.  A reasonable juror could find that Insperity's investigation and its findings contributed to the decision to terminate her.  It was an Insperity employee who first communicated to Jacobsen about the two-week paid leave of absence.  Text messages between Shegda and Sargent of Insperity indicate that Shegda provided the final decisions, but Insperity contributed substantive recommendations and advice which a reasonable juror could find guided these decisions.  Plaintiff's termination happened during an in-person meeting with both Shegda and Sargent.  Her termination letter is on Insperity's letterhead and

---

[9] The Agreement also states that "Insperity does not maintain a right to make decisions or give direction with regard to the products produced or services provided by the Client Company to its customers." Employee Agreement, ¶ 1.

refers to the termination of Plaintiff's employment with "Meron Medical and Insperity." ECF 23-9, Ex. 44. Shegda did not sign the letter. *Id*. The separation agreement given to Jacobsen was prepared and signed by Insperity. ECF 23-9, Ex. 45.

On balance, whether Insperity can be considered a joint employer is a close issue. But the fact that Insperity also provided all Meron's human resources services and was closely involved in the decision to terminate Plaintiff distinguishes it from cases where professional employment organizations like Insperity were found not to be a joint employer.[10]

### c. M&S and Meron as Joint Employers

Plaintiff also advances a joint employer relationship between Meron and its parent company, M&S. Analysis of the *Darden* factors indicates that there is insufficient evidence in the record to support a finding of M&S as Plaintiff's joint employer. M&S hired Plaintiff, but she was later transferred to Meron. She was paid by Insperity pursuant to its agreement with Meron, and there is nothing in the record to indicate that M&S was involved in her termination. Moreover, there is insufficient evidence in the record as to whether M&S exercised control over her daily activities to establish that it could be considered her joint employer.

---

[10] *See e. g. Nerviano v. Cont. Analysis Sys., LLC,* No. CV 17-4907, 2018 WL 2240533, at *4 (E.D. Pa. May 16, 2018) (holding that "[a]bsent allegations that ADP had some ability to dictate Nerviano's working conditions or played some role in the decision to terminate her" the professional employment organization was not joint employer); *Nardi v. ALG Worldwide Logistics,* 130 F. Supp. 3d 1238, 1249 (N.D. Ill. 2015), as amended (Sept. 21, 2015) (granting PEO's motion for summary judgment in part because there was "no substantive evidence that [the PEO] was involved in the discharge decision itself"); *Kuhn v. Comfort Hospice Care, LLC,* No. 2:11-CV-937 TS, 2012 WL 27695, at *2 (D. Utah Jan. 4, 2012) (finding that PEO was not joint employer in FMLA context where it only provided administrative human resources functions); *but see Woldu v. Hotel Equities, Inc.,* No. 1:09-CV-0685-HTW-CCH, 2009 WL 10668443, at *13 (N.D. Ga. Sept. 18, 2009), report and recommendation adopted, No. 1:09-CV-0685-HTW, 2010 WL 11507854 (N.D. Ga. Mar. 18, 2010) (holding PEO was not joint employer where it performed human resources services and participated in decision to terminate Plaintiff).

       d.  <u>M&S and Meron as Single Employer</u>

Next, Plaintiff argues that M&S should be viewed in combination with Meron and, taken together, they constitute a "single employer" for purposes of Title VII.

As a threshold matter, Meron argues that because M&S is not a named party, Plaintiff may not rely upon the size of the M&S workforce in advancing a single employer theory. Plaintiff has made no direct response to this argument, and neither party has cited any case law as to whether a putative joint or single employer must be named as a defendant. Some courts have held that the single-employer doctrine requires a plaintiff to name all entities included in the aggregation of employees, while others have engaged in the single-employer analysis even where some of the companies were not named as defendants. *See Battistone v. Sam Jon Corp.*, No. CIV.A. 00-5196, 2002 WL 32345692, at *4 (E.D. Pa. Oct. 4, 2002) (Pollak, J.) (discussing split among courts and holding that, in the context of summary judgment under the ADEA, four related unnamed corporations could be considered under a single employer theory).

Having reviewed the competing decisions, I am persuaded by Judge Pollak's analysis and conclude that the fact that M&S was not named is not a bar to considering it for purposes of aggregating employees under Title VII under the facts present in this record. Meron claims both prejudice and surprise, but given the symbiotic relationship between Meron and M&S, any suggestion that M&S lacked notice simply is not credible. *See Landon v. Agathat Harden, Inc.*, 6 F.Supp.2d 1333, 1338, 1339 n.4 (M.D.Ala.1998) (common ownership of companies refutes claims of prejudice). Moreover, because Plaintiff has not named M&S as a defendant, there is no risk of M&S itself being liable to Plaintiff. Further, with Mr. Shegda as sole owner of both Meron and M&S, he has personal knowledge of all the relevant facts concerning their interrelationship and

no prejudice can be claimed over a purported lack of discovery.[11]  In light of the lack of prejudice, I conclude that the fact that M&S is not named does not automatically preclude its consideration under a single employer theory.  *See, e.g., Battistone*, 2002 WL 32345692, at \*4 (E.D. Pa. Oct. 4, 2002); *Torres v. Liberto Mfg. Co.*, No. 3-01-CV-1888-H, 2002 WL 2014426 at \*3 n. 4 (N.D.Tex. Aug.30, 2002) (noting the defendant's objection to considering unnamed parties but proceeding to single-employer analysis); *Podsobinski v. Roizman,* No. 97-4976, 1998 WL 67548 at \*1 (E.D.Pa. Feb.13, 1998) (Padova, J.) (considering unnamed parties in the single-employer analysis); *Westphal v. Catch Ball Prods*. Corp., 953 F.Supp. 475, 477 (S.D.N.Y.1997) (same).

Having determined that M&S need not be named, I must still consider whether the parties may be considered together as a combined single employer for purposes of Title VII.  Under *Nesbit v. Gears Unlimited, Inc*., 347 F.3d 72, 85-85 (3d Cir. 2003), in determining whether an enterprises function as a single employer, a court must first look to whether a plaintiff can prove that a single company split into two or more entities of less than 15 employees to evade Title VII, after which a court should examine if the parent directed a subsidiary to perform a discriminatory act.  *Id*. at 86.  Absent such evidence, the court must "determine whether two or more entities' affairs are so interconnected that they collectively caused the alleged discriminatory employment practice." *Id*. Relevant operational factors to consider in that determination include "(1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (e.g., hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company

---

[11] I note that Plaintiff's counsel inquired during several depositions about the relationship between M&S and Meron, thereby putting the defense on notice of the potential relevance of the issue.

covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other."  *Id*. at 87.

Plaintiff points to no evidence that Meron and M&S were split to avoid Title VII, or that M&S as a corporate entity directed the discrimination alleged .[12]  Therefore, I must consider the degree of operational entanglement between the two companies.  In 2019, there was complete unity of ownership: Meron was an LLC, wholly owned by M&S, and M&S was a S-corporation with Shegda as the sole shareholder.  Shegda Dep. 14:2-15.  Meron and M&S also shared the same president, Shegda, and the same controller, Danielle Kuneck.  *Id*. 121:10-15.  As of October 2019, some of Meron and M&S's AR/AP, payroll and 401K were combined, and Meron "loaned" employees to M&S.  Shegda's Notes, ECF 23-8, Ex. 35.  Shegda testified that, in 2019, employees of both companies did work for each other and the employee handbooks for the companies would "be very, very similar if it wasn't identical."  Shegda Dep. 15:14-19; 27:11-17.  Michelle Martin-Laughlin, who was M&S's Operations Manager in 2019, testified that, "They're run the same. They're just separate entities.  They have separate tax ID numbers."  Michelle Martin Dep. (Aug. 17, 2021) 14:8-15, ECF 23-4, Ex. 7.  Neither Meron nor M&S had any dedicated human resources employees; both companies contracted with Insperity for that service.  Shegda Dep. 31:16-23. Importantly, Shegda not only assigned Ms. Jacobsen to Meron; he warned her in advance of potential issues with Aoun.

Given the degree of operational entanglement between M&S and Meron, particularly the fact that employees of both companies did work for the other company, as well as the shared

---

[12] Plaintiff contends that because John Shegda was personally involved in the discrimination alleged and is President of both Meron and M&S, "M&S should share the responsibility of Shegda's discriminatory acts with Meron."  Pl.'s Br. at 30.  These facts are certainly relevant to a single employer theory, but it goes too far to suggest that the same evidence is by itself sufficient to impose corporate liability absent more detailed evidence that corporate formalities were not observed.

ownership and leadership of the companies, and Mr. Shegda's personal involvement, there is a genuine issue of material fact as to whether Meron and M&S should be considered a single employer for Title VII purposes.   Plaintiff can therefore proceed under Title VII.

     e.   Hostile Work Environment Claims:

To establish a hostile work environment, a plaintiff must prove the following:

> (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability.

*Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).[13]

A reasonable factfinder could readily believe that Jacobsen's gender motivated Aoun's conduct.   In *Jensen v. Potter*, the Third Circuit reasoned that when harassment involves "sexual propositions, innuendo, pornographic materials, or sexually derogatory language," an inference of sex-based intent will usually arise but noted that discrimination also "need not be overtly sexual to be actionable."   435 F.3d 444, 454 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).   Under *Jensen,* Plaintiff's allegations regarding Aoun's repeated sexual remarks, including comments about her physique, clearly suffice to suggest a sex-based motivation.

The conduct must also meet the severe or pervasive standard.   Conduct is severe or pervasive when it is "sufficient 'to alter the conditions of [the employee's] employment and create an abusive working environment.'"   *Moody v. Atlantic City Board of Education*, 870 F.3d 206, 214 (3d Cir. 2017) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, (1986)).   To assess

---

[13] Plaintiff has brought a hostile work environment claim under Title VII and the PHRA.   Because the analysis required for adjudicating Plaintiff's Title VII and PHRA claims is identical, the Court will consider those two claims together.   *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317, n. 3 (2000) (stating that since the analysis required for adjudicating a PHRA claim is identical to a Title VII inquiry "we therefore do not need to separately address" the PHRA claim).

whether an environment is abusive or hostile, a district court must consider the totality of the circumstances, which include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23 (1993).

Here, Jacobsen alleges that Aoun's conduct was ongoing for more than two years.  His conduct included repeatedly prying into Plaintiff's dating life following her divorce; bragging in explicit terms about his own sexual exploits; telling Plaintiff that if he wasn't married, they would "hook up"; making multiple sexual comments about Jacobsen's anatomy; frequently talking about her menstrual cycle; telling Plaintiff that women belong at home cooking meals; stating that women did not belong on the shop floor; and generally treating her with rudeness and disrespect because she was a woman.

Defendants cite a series of district court and non-precedential Third Circuit cases where the conduct at issue was found not to rise to a hostile environment.  *See* Defs. Br. 24-26.  However, the conduct here goes beyond "simple teasing," "offhand comments, and isolated incidents." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Viewed collectively, Jacobsen's account provides sufficient evidence upon which a reasonable juror could conclude that she experienced severe or pervasive harassment that interfered with her work performance, in violation of Title VII's equality mandate.  *See Moody*, 870 F.3d at 214.

Jacobsen's testimony also provides a basis from which a reasonable fact finder could infer that Aoun's conduct detrimentally impacted her and would have impacted a reasonable person in similar circumstances.  Jacobsen told Aoun to stop prying into her dating life and also that she would never hook up with him.  She reported Aoun's disrespectful and crass behavior to Manno

and Aoun.  Jacobsen clearly believed that her work environment was abusive.  *See Harris*, 510

U.S. at 21.  Moreover, a reasonable person would also likely find such an environment to be hostile

and abusive, as Aoun's alleged behavior included repeated, explicit sexualized comments directed

at Plaintiff, as well as disparaging remarks about women in the workplace.

Jacobsen's hostile work environment claims nonetheless fails, because she does not

sufficiently demonstrate *respondeat superior* liability.  When, as here, a harassing employee does

not supervise the victim, the plaintiff must show that the "defendant knew or should have known

of the harassment and failed to take prompt remedial action."  *Kunin v. Sears Roebuck & Co*., 175

F.3d 289, 293–94 (3d Cir. 1999).  "[T]here can be constructive notice in two situations: where an

employee provides management level personnel with enough information to raise a probability of

sexual harassment in the mind of a reasonable employer, or where the harassment is so pervasive

and open that a reasonable employer would have had to be aware of it."  *Id*. at 294.

Plaintiff's response to the instant motions for summary judgment emphasizes the fact that

she complained to Manno and to Shegda, but the record is conspicuously silent as to whether she

conveyed the most relevant details.   Most significantly, during her deposition, when asked about

the specific, graphic comments that Aoun made to her, Plaintiff stated that she did not report these

comments to Insperity and that she could not recall if she reported them to Shegda.  Jacobsen Dep.

156:2-157:4;  170:7-12;  181:20-182:16;  184:6-20;  186:14-188:22;  189:2-200:22.  Tellingly,

Plaintiff's counsel did not ask Shegda during his deposition whether Plaintiff reported any of the

specific harassing behavior to him.  And while Manno stated that Jacobsen reported generally that

Aoun was "crass" and "disrespectful," the only specific comment she recalled was that Plaintiff

told her that Aoun repeatedly made references to her period to complain about Plaintiff's mood.

Manno Dep. 118:9-23.  Plaintiff relies heavily on the fact that Shegda warned her that Aoun was

chauvinistic prior to starting the job to indicate that Shegda should have known that she was subject to harassment.   However, a general warning of chauvinism or complaints about someone's disrespectful and crass behavior does not equate to knowledge of the specific, severe and pervasive comments that Plaintiff alleges that she was subjected to.  *See Kunin*, 175 F.3d at 294 (noting that employer is not required "to attain a level of omniscience, in the absence of actual notice, about all misconduct that may occur in the workplace.").

The record similarly does not support a finding that the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it.  In fact, Plaintiff noted that when Aoun "said inappropriate things to me, or treated me differently because I was a female . . . He did it alone, by himself . . . . I think he purposefully sought me out alone so no one would believe me."  Jacobsen Dep. 230:6-17.

Plaintiff argues that her complaint to Shegda in May 2018 after the altercation with Aoun was sufficient to give notice of the hostile environment and was insufficiently addressed.  But she concedes that the language she complained of in that altercation was all gender neutral and related to generally rude treatment.  And although Plaintiff alleges that her formal emailed complaint in September 2019 and subsequent communications with Insperity were sufficient to give notice of the hostile work environment, the record does not reflect that these complaints communicated the content of Aoun's sexually explicit, pervasive, harassing behavior.  *See Kunin*, 175 F.3d at 294 (noting that complaint to management of "cursing" was insufficient for constructive notice because it "did not communicate that the offensive language had sexual overtones").

I recognize that having to repeat anatomically specific and frankly sexual comments a co-worker is alleged to have made can be an embarrassing ordeal in its own right.  But if an employer is to be charged with responsibility for such conduct, the law is clear that it must have notice and

the opportunity to address the situation.  The record here does not support a finding that decision-makers were made aware of the most reprehensible conduct alleged, and I am therefore constrained to grant Defendants' motions as to the hostile work environment claims.

     f.   Retaliation Claims

Plaintiff has also brought a retaliation claim under Title VII and the PHRA.  To establish a prima facie case of retaliation, a plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006) (cleaned up).[14]  If the employee establishes her prima facie case, "the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id*. at 342 (cleaned up).

Because Plaintiff was forced to take leave and terminated, which clearly constitute adverse actions, I primarily will focus on whether Plaintiff engaged in protected activity and causation.  To satisfy the first element of her prima facie case, Plaintiff must show that she held "an objectively reasonable belief, in good faith, that the activity [she opposed] is unlawful under Title VII." *Id*. at 341.  Verbal complaints to management are sufficient to constitute protected activity. *Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 288 (3d Cir. 2001) (stating that complaints

---

[14] Plaintiff's PHRA claims "follow the analytical model developed by the United States Supreme Court for Title VII cases." *Allegheny Hous. Rehab. Corp. v. Com., Pennsylvania Human Relations Comm'n*, 532 A.2d 315, 317 (Pa. 1987); *see also Bailey v. Storlazzi,* 729 A.2d 1206, 1214 n. 9 (Pa. Super. Ct.1999) (explaining that the elements of state and federal retaliation claims, brought pursuant to the PHRA and Title VII respectively, are identical).

to employer, "whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case"). And opposition to unlawful discrimination need not be significant or formal. Rather, the Third Circuit has directed courts to focus on the "message being conveyed rather than the means of conveyance." *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.,* 450 F.3d 130, 135 (3d Cir. 2006).

Here, Plaintiff's September 2019 complaint meets the standard for protected activity. Her email references Aoun's "disrespect and hostile actions" which she states, "cannot be excused by [Shegda] labeling him chauvinistic." ECF 23-6, Ex. 17. She further states, "It is evidence that I have been treated differently and it is becoming uncomfortable for me and inflicting mental distress." *Id.* Moreover, in the communications with Shegda and Insperity following her email, Plaintiff clearly complained that she was being excluded from management communications on the basis of her gender. This is evident based on the subject line of Sargent's email sent following their conversation: "Gender Discrimination Allegations from EE." ECF 23-6, Ex. 19.

For the third element, a plaintiff may rely on a range of evidence to demonstrate the causal link between the protected activity and the adverse action, including by showing temporal proximity that is "unusually suggestive of a retaliatory motive." *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000). The Third Circuit has stated that "[t]hough we generally hold that closeness in time alone cannot establish causation, we have found that close temporal proximity or an added factor making the closeness unusually suggestive can suffice." *Fraternal Ord. of Police, Lodge 1 v. City of Camden,* 842 F.3d 231, 242 (3d Cir. 2016). Three days after Plaintiff's emailed complaint, Shegda decided that he wanted Plaintiff to take two weeks paid leave, because Jacobsen "is causing so much chaos he want[ed] to pay her for two weeks to stay home while he is out of the country." Williams Call Notes, Ex. 23. Clearly, a reasonable juror could find that this forced

leave was related to Plaintiff's complaint.  When Plaintiff protested and refused to take the leave, Shegda threatened her position.  Moreover, before Plaintiff's return or the conclusion of Insperity's investigation, Shegda and Sargent were already communicating regarding Plaintiff's termination such that she was terminated without ever being allowed to return to work.  Here, the close temporal proximity and surrounding context is sufficient to be unusually suggestive of a retaliatory motive.  *See Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989) (two days is unusually suggestive); *Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005) (holding that three-month period between protected activity and adverse action raises inference of retaliation).

Because Plaintiff has produced sufficient evidence to support a prima facie case of retaliation, the burden shifts to Meron and Insperity to provide a legitimate, non-retaliatory reason for Plaintiff's leave and termination.  The Court of Appeals has described this burden as "relatively light," as the defendant need not prove that its tendered reason actually motivated its decision. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994).  Here, Defendants argue that Plaintiff was terminated because her position was eliminated due to the upcoming merger of Meron, M&S,  and KVI, which occurred in January 2020.  Shegda testified that her position was eliminated because the "administrative end was overstaffed," Plaintiff's workload had been declining, and her role was "no longer needed."  Shedga Dep. 159:2-8.  This suffices for Defendants to meet their burden.

The burden therefore shifts back to Plaintiff, who must "be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore,* 461 F.3d at 342 (cleaned up).  To do so, Plaintiff can demonstrate "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions from which a reasonable juror could conclude that the Defendants' explanation is unworthy of credence,

and hence infer that the employer did not act for the asserted [non-retaliatory] reasons." *Carvalho-Grevious v. Delaware State Univ.,* 851 F.3d 249, 262 (3d Cir. 2017) (cleaned up).

Here, there is a wealth of evidence from which a reasonable fact finder could find that retaliation was the real reason for the adverse employment action. For example, Plaintiff was terminated in September 2019, but the merger did not take place until January 2020. When asked why Plaintiff could not have continued to work at Meron for the remainder of 2019, Shegda replied that, "The untenable situation that had been created was, you known, between, within Meron Medical. Meron Medical was now no longer able to function on an ongoing, you know, like in a viable way because of the turmoil caused by this." Shegda Dep. 159:24-160:4. A reasonable juror could interpret "this" to refer to Plaintiff's complaint, thus indicating that her termination was in retaliation for her complaint. This inference is supported by the fact that no one else was terminated when Jacobsen was terminated and, prior to her termination, Plaintiff alleges that she had only positive performance reviews. Moreover, the circumstances surrounding her paid leave could raise an inference of retaliation. Shegda stated that he needed Plaintiff out on paid leave because of the chaos she was causing, suggesting that reason for her removal was personal and retaliatory, rather than motivated by legitimate business needs and administrative overstaffing. This is further supported by Shegda's text to Sargent stating that he knows that she is going to sue him, but he wants her gone. Finally, the inconsistencies in Insperity's handling of the investigation, including Insperity's failing to ever interview Aoun, naming the wrong employee as the harasser in the investigation report, not following its own internal procedures for EEO complaints, and changing the characterization of Plaintiff's complaint from EO to ER, could allow a reasonable juror to conclude the investigation was not done in good faith and that Plaintiff's termination was for retaliatory reasons.

Considering this, I conclude that Ms. Jacobsen has raised a "factual issue regarding the employer's true motivation" for the adverse actions taken against her, and as such, her retaliation claims against Meron and Insperity withstand summary judgment. *Carvalho-Grevious*, 851 F.3d at 263.

IV.   **Conclusion**

For the reasons set forth above, Defendants' Motions for Summary Judgment will be granted in part and denied in part.   An appropriate order follows.


  /s/ Gerald Austin McHugh
United States District Judge